The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF SAGUACHE, Plaintiff-Appellee,

v.

Donald FLICKINGER and Charles R. Flickinger, Defendants-Appellants.

No. 81SA306.

Supreme Court of Colorado, En Banc.

Sept. 4, 1984.

Robert S. Crites, Jr., Monte Vista, for plaintiff-appellee.

Woodrow, Roushar & Weaver, Gerald D. Weaver, Montrose, for defendants-appellants.

QUINN, Justice.

Donald and Charles Flickinger appeal from a district court judgment declaring a road traversing their property to be a public highway within the meaning of section 43–2–201(1)(c), 17 C.R.S. (1973), because the road had been adversely used by the public for twenty consecutive years. The Flickingers challenge the sufficiency of the evidence underlying the judgment and also claim that the court's application of section 43–2–201(1)(c) to the road in question violates equal protection of the laws and results in an unconstitutional taking of their property without just compensation.[1] We affirm the judgment.

## I.

In September 1978 the Board of County Commissioners of Saguache County (board) filed this action in the District Court of Saguache County, naming as defendants Charles Flickinger, the owner of a certain parcel of real property in Saguache County, and his son, Donald Flickinger, who managed the property. The board sought a judicial declaration that a road traversing the Flickinger property and commonly known as Ford Creek Road was a public highway, and also requested an injunction prohibiting the continued obstruction of the road by the Flickingers. The court ulti-

---

1. Because the Flickingers challenge the constitutionality of section 43–2–201(1)(c), 17 C.R.S. (1973), we determined that jurisdiction is prop- erly in this court. §§ 13–4–102(1)(b) and 13–4– 110(1)(a), 6 C.R.S. (1973).

mately declared the road to be a public highway and enjoined the Flickingers from obstructing public use of the road. Because the facts are critical to a proper resolution of the issues before us, we set out in some detail the evidence presented to the trial court.

In 1924 a dirt road was built along Ford Creek in Saguache County, approximately 10 miles west of Saguache, Colorado.[2] The road proceeded in a generally northerly direction for several miles from State Highway 114, passing through private property and lands managed by the United States Bureau of Land Management, and eventually wound to the east into the Rio Grande National Forest. During the next twenty-five years the road was used sporadically by persons seeking access to sightseeing, hunting, and fishing areas, as well as by local ranchers. Sometime during this period a gate was erected at the base of the road, but the gate was not locked.

In 1950 Charles Flickinger purchased a tract of land through which the road traversed. Flickinger, together with his son Donald, has managed the property since that time. At the time of the Flickinger purchase the road commenced on the west side of Ford Creek and, after running in a northeasterly direction for approximately three quarters of a mile, crossed to the east side of the creek. Because swampy portions along the west side of the creek were

making travel difficult, an owner of upstream ranch property moved the lower portion of the road in 1953 to that part of the Flickinger property on the east side of Ford Creek. This relocation was effected without objection by Charles Flickinger. The road has remained in approximately the same location since that time. According to a center line survey made by a Bureau of Land Management engineer during the period of 1975 to 1977, the road extends across the Flickinger property from State Highway 114 for slightly more than six tenths of a mile before reaching the property managed by the Bureau of Land Management. That portion of the road traversing the Flickinger property is, with some minor variations, twelve feet in width.

In August 1953 the board filed a county road system map with the Saguache County Clerk. The map, which showed the road as a county road within the county highway system, was based on a 1952 inventory of county roads and depicted the road as commencing on the west side of the creek and then crossing over the stream to the east side. After publication of official notices and two public hearings, the board adopted the map as the official map of the Saguache County road system on October 5, 1953.[3] The effect of the board's action was to select the Ford Creek Road as a county highway that qualified for state maintenance funds.[4] Saguache County, af-

---

**2.** For some considerable period prior to 1924 the road was a "wagon" road consisting basically of two dirt tracks. In 1924 Sam Calvert, who had homesteaded much of the area around Ford Creek, died and was to be buried on ground that was not accessible to motor vehicle traffic. In order to permit cars to get to the ground where Calvert was going to be buried, local ranchers transformed the wagon road to a dirt road, and it has been used for motor vehicle traffic since that time.

**3.** Section 43-2-110, 17 C.R.S. (1973), provides, in relevant part, as follows:

"(1) The initial selection of the county road system shall be done in the following manner:
(a) The board of county commissioners of each county shall cause a map to be prepared showing each road in the county primary and secondary system and designating each pri-

mary road by appropriate number, and said board shall cause notice of intention to adopt said map as the official map of such system to be given, which notice shall specify the time and place at which all interested persons will be heard. Such notice of intention shall be published once a week for at least two successive weeks preceding the date of such hearing in a newspaper of general circulation in the county.
(b) After such hearing, the board of county commissioners shall adopt such map, with any changes or revisions deemed by it to be advisable, as the official map of the road system of the county."

**4.** Revenues collected as a part of the highway users tax fund, §§ 43-4-201 to 216, 17 C.R.S. (1973 & 1983 Supp.), are allocated by the state between several state and local agencies, includ-

ter the board's approval of the map, began receiving state funds to maintain the road and annually filed with the department of highways a road map or letter outlining any changes in the county road system.[5] These submissions to the department of highways continued to show the road as commencing on the west side of Ford Creek until 1967, when the county submitted a map, based on a 1964 road inventory, showing the road as lying entirely on the east side of the stream. County filings after 1967 listed the road as completely on the east side of the stream.

The maps submitted by the county to the department of highways classified the road as "bladed," but maps filed in 1966 and 1967 designated the road as "gravel surfaced." The evidence showed that county employees graded the road with county equipment many times during the 1960's and 1970's. In addition, the county in 1953 installed two culverts under the road and over the years removed snow from the road at the request of local ranchers.

After the purchase in 1950, Charles Flickinger maintained a fence and a gate to separate his property from State Highway 114. The gate was located at the road base near its intersection with the state highway. Except for a brief period during the early 1950's, the gate was not locked. The Flickingers, until recent years, allowed a local rancher to graze livestock on their parcel, and this rancher performed most of the maintenance on the gate.

Since the purchase of the property in 1950 the Flickingers were always aware that the public had used the road in traveling to nearby hunting, fishing, and picnicking areas and that governmental employees had also used it to gain access to adjacent federal lands, and generally kept the road open for public use. While some persons would occasionally ask for permission to use the road, most users did not. Charles Flickinger would occasionally tell hunters to leave his property when they actually camped on it or made a mess of the area, but he never interfered with the use of the road, at least prior to 1977. In that year the Flickingers became concerned about the increasing number of persons traversing the road and placed a lock on the gate. In 1978 the department of highways struck the road from its inventory of public highways and discontinued payment of funds to Saguache County for maintenance of the road.

The trial court, based on the foregoing facts and after personally viewing the road, made the following pertinent find-

ing county governments. Counties may expend these funds "only on the construction, engineering, reconstruction, maintenance, repair, equipment, improvement, and administration of the county highway systems together with acquisition of rights-of-way and access rights for the same and for no other purpose." § 43–4–207(1), 17 C.R.S. (1983 Supp.). Twenty percent of the funds set aside for county governments are allocated to individual counties on the basis of the number of motor vehicles registered in a particular jurisdiction, § 43–4–207(2)(a), 17 C.R.S. (1973), whereas eighty percent of the tax proceeds are allocated in proportion to the mileage, adjusted to reflect the difficulty of maintenance, of "open, used, and maintained public highways, as defined in section 43–2–201, in each county, excepting mileage of state highways." § 43–4–207(2)(b), 17 C.R.S. (1983 Supp.). Section 43–2–201, 17 C.R.S. (1973), defines public highways to include all roads over private land dedicated to public use by deed or due process of law, all roads over private land that have been adversely used without interrup-

tion or objection by the owner for twenty years, all toll roads purchased by a county and opened to public use, and all roads over the public domain. "Open, used, and maintained" roads are defined in section 43–4–207(2)(b), 17 C.R.S. (1983 Supp.), to encompass highways "legally open to public travel by ordinary motor vehicles at all times, usable at all times except during adverse weather conditions, and maintained by work of county maintenance crews or crews of other governmental agencies within this state which are authorized to engage in highway, road, or street maintenance or improvement performed on a continual basis."

5. Section 43–2–120(5), 17 C.R.S. (1983 Supp.), requires the board of county commissioners to annually file with the state department of highways a map showing any changes in the mileage or location of any road within the county system of roads, together with any changes in the surface classification of any county roads which have been made during the preceding calendar year.

ings: that since 1953 the road has been located on the Flickinger property as shown in the center line survey made during 1975–77; that despite the 1952 inventory of county roads showing the starting point of the road on the west side of Ford Creek, the county, beginning on October 5, 1953, continuously designated the portion of the road passing through the Flickinger property as a county highway and serviced the road as the need arose; that members of the public had used the road for recreational purposes without obstruction or objection by the Flickingers from time immemorial up to 1977; that prior to 1977 employees of the United States Bureau of Land Management and United States Forest Service, as well as state wildlife officials, freely used the road to gain access to adjoining lands; and that the gate at the foot of the road was used to keep livestock away from State Highway 114 and was not intended to obstruct public access to the road before 1977. The court concluded that the portion of the road passing through the Flickinger property was a public highway within the purview of section 43–2–201(1)(c), 17 C.R.S. (1973), and that application of the statute to the property in question did not deny the Flickingers equal protection of the laws or constitute an unconstitutional taking of property without just compensation. The trial court accordingly entered an injunction prohibiting the Flickingers from obstructing public use of the road.

## II.

The Flickingers initially contend that the evidence was insufficient as a matter of law to sustain the trial court's findings and judgment. We find their claim to be without merit.

 Section 43–2–201(1)(c), 17 C.R.S. (1973), states in pertinent part that "[a]ll roads over private lands that have been used adversely without interruption or objection on the part of the owners of such

lands for twenty consecutive years" are declared to be public highways. This provision codifies the common law method by which the public can obtain title to roadways by adverse use. *Mahnke v. Coughenour*, 170 Colo. 61, 67, 458 P.2d 747, 750 (1969); *see People ex rel. Mayer v. San Luis Valley Land & Cattle Co.*, 90 Colo. 23, 5 P.2d 873 (1931). A party seeking to establish a road across private property as a public highway must demonstrate the following: (1) members of the public must have used the road under a claim of right and in a manner adverse to the landowner's property interest; (2) the public must have used the road without interruption for the statutory period of twenty years; and (3) the landowner must have had actual or implied knowledge of the public's use of the road and made no objection to such use. *See Silver Plume v. Hudson*, 151 Colo. 394, 400, 380 P.2d 59, 62 (1963); *People ex rel. Mayer*, 90 Colo. at 26–27, 5 P.2d at 874–75; *Board of County Commissioners v. Ogburn*, 38 Colo.App. 212, 214, 554 P.2d 700, 701 (1976). A party relying on section 43–2–201(1)(c) is aided by a presumption that "the character of the use is adverse where such use is shown to have been made for a prescribed period of time." *Shively v. Board of County Commissioners*, 159 Colo. 353, 357, 411 P.2d 782, 784 (1966); *accord, e.g., Mahnke*, 170 Colo. 61, 458 P.2d 747; *Martino v. Fleenor*, 148 Colo. 136, 365 P.2d 247 (1961). The evidence, when viewed in light of these guidelines, provides sufficient support for the district court's determination that the road passing through the Flickinger property was a public highway.

 There was evidence demonstrating that members of the public had used the road under a claim of right and in a manner adverse to the Flickinger's property interests at least since 1953. The county initially asserted the public character of the road when it incorporated the road into the county road system in that year.[6] It

---

**6.** The placement on the initial county road system map of the lower portion of Ford Creek Road as commencing on the west side of the

creek, rather than the east side, and the perpetuation of this error in subsequent county filings between 1954 and 1967 does not, in our view,

reaffirmed this claim by receiving state funds to maintain the road and by using county employees to install culverts, to periodically grade the road, and to remove snow during the winter season.[7] There was also evidence establishing that the public, particularly during the period between 1953 and 1977, continuously entered the Flickinger property through the gate at the foot of the road and used the road for recreational purposes and as a means of access to other adjacent lands. Finally, there is no dispute that the Flickingers had actual knowledge of the public use of the road and generally acquiesced in it.[8]

▋ The Flickingers nonetheless contend that the existence of the gate at the foot of the road necessarily prevented the public from acquiring title to the road. We are unpersuaded by their argument. While we have recognized that the placement of a gate to obstruct free travel along a road will ordinarily render public use of the road permissive only, *Lang v. Jones,* 191 Colo. 313, 552 P.2d 497 (1976); *Martino,* 148 Colo. 136, 365 P.2d 247; *People ex rel. Mayer,* 90 Colo. 23, 5 P.2d 873, the placement of the gate does not conclusively establish the character of the public use as permissive and nonadverse. A gate, in other words, may be erected for purposes other than obstruction of public travel. *See, e.g., Shively,* 159 Colo. 353, 411 P.2d 782 (gate erected to protect property and not intended to foreclose public travel along roadway); *Ogburn,* 38 Colo.App. 212, 554 P.2d 700 (existence of gates on highway properly considered as evidence pertaining to adverse use, but did not conclusively establish that public use was only a permissive use). The evidence in this case discloses that the gate was primarily for the benefit of the rancher who had been using the Flickinger property as pasture for his livestock. Furthermore, although the Flickingers were aware of the public's entry onto their property through the gate, they took no steps prior to 1977 to lock out the public from their property. Under this state of the record we cannot say that the court erred when it determined that the gate had been used to keep livestock away from State Highway 114 rather than to obstruct public access to the road. In summary, sufficient evidence supports the district court's declaration of the road as a public highway pursuant to section 43–2–201(1)(c), 17 C.R.S. (1973). *See, e.g., Shively,* 159 Colo. 353, 411 P.2d 782; *Rugg v. Jones,* 157 Colo. 526, 403 P.2d 770 (1965); *Christianson v. Cecil,* 109 Colo. 510, 127 P.2d 325 (1942); *Ogburn,* 38 Colo.App. 212, 554 P.2d 700; *Boulder Medical Arts, Inc.*

negate the clear intent of the board to declare the road itself a public highway.

7. The district court, relying on *Board of County Commissioners v. Masden,* 153 Colo. 247, 385 P.2d 601 (1963), applied a clear and convincing standard of proof in resolving the board's claim that the Ford Creek Road was a public highway. *Cf. Raftopoulos v. Monger,* 656 P.2d 1308 (Colo. 1983) (clear and convincing proof required in adverse possession action). The Flickingers argue that "the evidence is far from clear" as to whether the servicing of the road by the county was for the benefit of the public. Although the record does indicate that the county had removed snow from the road at the request of local ranchers, there is other evidence in the record supporting the district court's determination that the county performed these tasks in order to aid public use of the road.

8. The Flickingers also challenge several specific findings of the district court. They argue that the court erred in finding that the road "passes through the Flickinger property a distance of approximately three quarters of a mile to one mile." The center line survey conducted in 1980 shows that the road crosses Charles Flickinger's property for slightly more than six tenths of a mile. To the extent that the district court erred in its finding of "three quarters of a mile to one mile," such error is clearly harmless in that it does not affect the district court's conclusion regarding the applicability of section 43–2–201(1)(c), 17 C.R.S. (1973), to the facts of the case. In addition, the Flickingers also argue that the district court's finding that the county had designated 3.02 miles of the road as public in 1953 was based on inadmissible hearsay, namely, an exhibit kept by the department of highways. We reject the Flickingers' argument for two reasons. First, they only objected to the admission of the exhibit on authentication grounds, *see* CRE 902, and thus failed to preserve this asserted error for appeal. Second, there was testimony indicating that the record satisfied both the public record exception, CRE 803(8), and the business record exception, CRE 803(6).

*v. Waldron,* 31 Colo.App. 215, 500 P.2d 170 (1972).

### III.

The Flickingers next claim that the application of section 43–2–201(1)(c), 17 C.R.S. (1973), to their property violated their right to equal protection of the laws. U.S. Const. amend. XIV; Colo. Const. art. II, § 25. They base their equal protection argument on the fact that section 43–2–201(1)(c) permits roads across private property to be declared public, but does not allow private citizens to adversely possess property from the state. Their argument, we believe, proceeds from the faulty premise that section 43–2–201(1)(c) creates a classification which implicates a legitimate equal protection claim.

 The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." The right to equal protection of the laws, which finds support in the Due Process Clause of Article II, Section 25 of the Colorado Constitution, *see, e.g., Heninger v. Charnes,* 200 Colo. 194, 613 P.2d 884 (1980); *Vanderhoof v. People,* 152 Colo. 147, 380 P.2d 903 (1963); *People v. Max,* 70 Colo. 100, 198 P. 150 (1921), "guarantees that all parties who are similarly situated receive like treatment by the law." *J.T. v. O'Rourke,* 651 P.2d 407, 413 (Colo.1982). As the United States Supreme Court observed in *New York City Transit Authority v. Beazer,* 440 U.S. 568, 587–88, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979):

> "The [Equal Protection] Clause announces a fundamental principle: the State must govern impartially. General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle. Only when a governmental unit adopts a rule that has a special impact on less than all the persons subject to its jurisdiction does the question whether this principle is violated arise."

A threshold inquiry in any equal protection claim, therefore, is whether persons who are in fact similarly situated are subjected by some governmental act to disparate treatment.[9]

 Section 43–2–201(1)(c), 17 C.R.S. (1973), does not subject similarly situated persons to disparate treatment. This statute merely establishes general statutory criteria by which the public character of roads on private lands shall be determined and applies with equal force to all private lands. In short, section 43–2–201(1)(c) has an equal impact on all owners of private roads within the state and does not create a classification that implicates an equal protection issue.

 The Flickingers' argument really boils down to the question of whether the state is prohibited from enacting a forfeiture scheme applicable to private property without according private landowners an opportunity to exercise the same right of

---

**9.** When a statute is directed to less than all persons within the jurisdiction, the equal protection principles that are applicable depend on the character of the statutory classification. Where, for example, the classification creates a suspect class by singling out religious, racial, or other discrete and insular minorities, or where the statutory classification affects a fundamental right, the state must establish that the classification is necessarily related to a compelling governmental interest. *E.g., San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). In cases involving a classification based on other suspect criteria, such as gender or illegitimacy, an intermediate standard of review has been applied to require the state

to demonstrate a substantial relationship between the classification and the furtherance of an important governmental interest. *E.g., Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). "In the absence of a suspect classification, an infringement upon a fundamental right, or a classification triggering an intermediate standard of scrutiny, a statutory classification will be upheld as long as it has some reasonable basis in fact and bears a reasonable relationship to a legitimate governmental interest." *Dawson by and through McKelvey v. Public Employees' Retirement Association,* 664 P.2d 702, 707 (Colo.1983); *see also San Antonio School District,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16; *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

forfeiture against property held in the public domain. The answer, we submit, is that the state in its sovereign lawmaking capacity acts on behalf of all the people and, as such, is not constitutionally required to subject the people's rights to the very same forfeitures applicable to individual persons within its jurisdiction. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam) (state not a person for purposes of Equal Protection Clause); *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (state not a person for purposes of Due Process Clause of Fifth Amendment). We therefore reject the Flickingers' equal protection claim.

## IV.

■ The Flickingers' final contention is that the application of section 43–2–201(1)(c), 17 C.R.S. (1973), to their property constitutes a governmental taking in contravention of Article II, Section 15 of the Colorado Constitution, which states that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." There is no question that the purpose of section 43–2–201(1)(c) is to confer a benefit on the public by rendering certain private roads freely accessible for public use as public highways. The question raised by the Flickingers is whether the application of the statute to their property constitutes a "taking" in the constitutional sense of that term.

■ Although the concept of a taking may originally have contemplated only physical appropriation, it is clear today that nonacquisitive governmental action may constitute a taking when the governmental activity substantially impairs an owner's use of the property. J. Nowak, R. Rotunda, & J. Young, *Constitutional Law* 483 (2d ed. 1983). Unfortunately, however, the question of what constitutes a taking has proved to be a problem of considerable difficulty. While the constitutional prohibition against governmental taking without just compensation is designed to bar the state from forcing some people alone to bear public burdens that, in fairness and justice, should be borne by the public as a whole, courts have simply been unable "to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).[10]

In resolving the Flickingers' claim, we take guidance from the United States Supreme Court in construing the Fifth Amendment prohibition against governmental taking of private property without just compensation. In *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), the Court considered the constitutionality of Indiana's Dormant Mineral Interests Act, which generally provided for the termination of severed mineral interests not used for twenty consecutive years unless the owner filed a claim during that period in the local county recorder's office.[11] After noting that property interests generally find their source in state law, and not the federal constitution, the

---

**10.** One commentator has observed that the term "taking" is a shorthand constitutional expression "for any sort of publicly inflicted private injury for which the Constitution requires payment of compensation." Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L.Rev. 1165, 1165 (1967).

**11.** The Indiana Dormant Mineral Interests Act had no general requirement that any specific notice be given to a mineral interest owner prior to the statutory termination of the interest, but did authorize an owner of ten or more interests who inadvertently omitted some of these interests in filing a statement of claim with the county recorder's office to preserve the omitted interests by making a supplemental filing within sixty days of receiving actual notice of the termination of the mineral interest. It also set forth a procedure by which the surface owner who succeeded to the ownership of the mineral interest could give notice to the former owner that the mineral interest had lapsed. *Texaco, Inc. v. Short*, 454 U.S. 516, 519–20, 102 S.Ct. 781, 786–87, 70 L.Ed.2d 738 (1982).

Court held that the application of the Indiana statute to the mineral rights in question did not constitute a taking of private property without just compensation. The Court, relying on analogous precedent, reasoned as follows:

"Through its Dormant Mineral Interests Act, ... the State has declared that this property interest is of less than absolute duration; retention is conditioned on the performance of at least one of the actions required by the Act. We have no doubt that, just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest.

"From an early time, this Court has recognized that States have the power to permit unused or abandoned interests in property to revert to another after the passage of time. In *Hawkins v. Barney's Lessee*, 5 [30 U.S.] Pet. 457 [8 L.Ed. 190], the Court upheld a Kentucky statute that prevented a landowner from recovering property on which the defendant had resided for more than seven years under a claim of right.... Similarly, in *Wilson v. Iseminger*, 185 U.S. 55 [22 S.Ct. 573, 46 L.Ed. 804], the Court upheld a Pennsylvania statute that provided for the extinguishment of a reserved interest in ground rent if the owner collected no rent and made no demand for payment for a period of 21 years. Though the effect of the Pennsylvania statute was to extinguish a fee simple estate of permanent duration, the Court held that the legislation was valid.

 * * * * * *

"The Indiana statute is similar in operation to a typical recording statute. Such statutes provide that a valid transfer of property may be defeated by a subsequent purported transfer if the earlier transfer is not properly recorded. In *Jackson v. Lamphire*, 3 Pet. [28 U.S.] 280 [7 L.Ed. 679], the Court upheld such a statute, even as retroactively applied to a deed that need not have been recorded at the time delivered.

 * * * * * *

"These decisions clearly establish that the State of Indiana has the power to enact the kind of legislation at issue. In each case, the Court upheld the power of the State to condition the retention of a property right upon the performance of an act within a limited period of time. In each instance, as a result of the failure of the property owner to perform the statutory condition, an interest in fee was deemed as a matter of law to be abandoned and to lapse." 454 U.S. at 526–29, 102 S.Ct. at 790–91 (footnotes omitted).

■■■ This case is not analytically distinguishable from *Texaco, Inc.* Charles Flickinger originally had a fee interest in the private road across his property, subject to certain conditions imposed by state law. By virtue of section 43–2–201(1)(c), the private road could be declared a public highway if: (1) members of the public used the road under a claim of right and in a manner adverse to the landowner's property interest; (2) the public used the road without interruption for the statutory period of twenty years; and (3) the landowner, with actual or implied knowledge of the public use of the road, made no objection to the use. *E.g., Silver Plume,* 151 Colo. at 400, 380 P.2d at 62; *Ogburn,* 38 Colo.App. at 214, 554 P.2d at 701. The effect of section 43–2–201(1)(c) is simply to require an owner desirous of retaining his interest in property that he knows is subjected to continuous public use to prohibit such public use or to make manifest his objection to it. The state of Colorado clearly has the power to condition the ownership of an interest in property upon compliance with conditions that impose such a slight burden on the owner. The failure of the Flickingers to comply with these statutory conditions resulted in the loss of their interest in the road as a private road and in the creation of a public highway, with the result that the application of section 43–2–201(1)(c) to

the road did not constitute a governmental taking for which compensation was required.

The judgment is affirmed.