740 P.2d 11 (1987)
The PEOPLE of the State of Colorado, In the Interest of, C.B., a Child, Plaintiff-Appellee, and Concerning
D.B. and L.B., Respondents-Appellants.
No. 85SA353.
Supreme Court of Colorado, En Banc.
June 29, 1987.
William Thiebaut, Jr., Asst. Co. Atty., Pueblo, for plaintiff-appellee.
James M. Croshal, Pueblo, for respondent-appellant D.B.
Robert L. Hernandez, Pueblo, for respondent-appellant L.B.
ERICKSON, Justice.
D.B. and L.B. (the parents) appeal an order of the Pueblo County District Court terminating their parental rights in their minor daughter, C.B.[1] The parents contend (1) that section 19-11-105(2)(a), 8B C.R.S. (1986), discriminates against mentally ill parents and violates the Equal Protection Clause of the fourteenth amendment to the United States Constitution, and (2) that the evidence was insufficient for termination of the parent-child legal relationship. We affirm the judgment of the district court.

*12 I.
L.B. (the father) and D.B. (the mother) are developmentally disabled and suffer from mental illnesses. They were married in 1976, and their one child, C.B., was born on October 25, 1978. The family has had a lengthy history of involvement with the Pueblo County Department of Social Services (Department).[2] Because the respondents challenge the sufficiency of the evidence at the termination hearing, the facts are set forth in detail.

A. Events Preceding Termination Hearings
In early June 1982, the welfare of C.B. was allegedly endangered. The mother contacted the Department because of her concern for the safety of C.B. She related a series of events that caused her to be concerned about C.B.[3] and stated that she and her husband "were fighting too much" and were contemplating divorce. A caseworker applied for an ex parte emergency order and recommended that a petition in dependency and neglect be filed. The trial court granted an ex parte order on June 7, 1982, and placed the child in the Department's custody. A "shelter hearing" was held on June 8 and the court found that the allegations in the affidavit supporting the motion for the ex parte order were established by a preponderance of the evidence. See §§ 19-1-103(25), 19-2-103, 8B C.R.S. (1986). Custody of C.B. was placed in the Department for a period of one year, and the Department was ordered to file a dependency and neglect petition. The trial court scheduled a ninety-day review hearing for September 8, 1982.
The Department filed a petition in dependency and neglect on June 25, 1982, and a proposed treatment plan was prepared to assist the parents. The treatment plan required the parents to obtain psychiatric evaluations in order to assess their (1) current level of functioning, (2) insight into their marital and child-care problems, (3) ability to understand the present and potential needs of C.B., (4) ability to control impulsive behavior and cope with stress, and (5) need for future treatment. The plan also required the parents to comply with any treatment recommended as a result of psychiatric evaluation. The parents were required to maintain the family residence in a neat and orderly fashion and to participate in parenting classes and the Infant Stimulation Follow-Along Program, both of which were designed to improve parenting skills. All reports of the evaluating agencies were to be filed with the trial court and the parents were given twenty to thirty days from the filing of each report to submit objections. At the ninety-day review hearing on September 8, 1982, the proposed treatment plan was adopted with certain minor amendments. The matter was set for a six-month review on March 4, 1983.
On October 29, 1982, the parents, through their court-appointed counsel, filed a stipulation which confessed the dependency and neglect petition. The parents agreed that, if an adjudicatory hearing were held, sufficient evidence would be introduced *13 to show that C.B.'s environment was injurious to her welfare. See § 19-1-103(1), (20)(c), 8B C.R.S. (1986). The trial court approved the adjudicatory stipulation by its order of December 14, 1982, and directed the parents to comply with the treatment plan.
A dispositional hearing was held on June 15, 1983. Dr. Jose Vega, a psychologist with the Spanish Peaks Mental Health Center, testified that he had conducted separate psychological examinations of the parents. He concluded that both parents functioned at a very low intellectual level and suffered from chronic personality disorders. Dr. Vega provided poor prognoses for improvement, and maintained that the parents were incapable of caring for C.B. Dr. Benjamin Green, a psychiatrist, also examined the parents and C.B. He concurred with Dr. Vega's psychological prognoses, and testified that the parents were unable to control the behavior of C.B. John Madrid, a psychiatric social worker, testified that the parents were currently stable and demonstrated growth in their therapy regimes under the treatment plan. He was unable, however, to state whether the parents could care for C.B. because he had not spent sufficient time with them in his examination. He concluded that if both parents continued to make progress, they might be able to care for C.B.
The trial court concluded that the evaluations and poor prognoses of Drs. Green and Vega were entitled to "considerable weight," but concurred with John Madrid's sentiment that it was too early to "write off either parent." The court ordered C.B. to remain in the custody of the Department for an additional year, and directed the Department to submit an updated treatment plan. The plan was to provide for (1) a program of infant stimulation for the child and the parents, (2) couples therapy for the parents, (3) a psychiatric or psychological evaluation of C.B., (4) unsupervised, weekly visitation by the parents and C.B., (5) the father's continued employment at Pueblo Diversified Industries with good attendance, and (6) a stable home environment and review to follow in six months. The Department submitted the updated treatment plan on December 29, 1983, and the court approved the new treatment plan on January 26, 1984. The case was set for a six-month review on July 17, 1984.
The parties' progress with the new treatment plan was relayed to the court in a variety of reports in January 1984.[4] Despite the mixed assessments of the parents' ability to care for C.B., Dr. Hubert Thomason, a psychiatrist, evaluated the parents, and, in February 1984, suggested that a reunification of the family was possible. Dr. Thomason stated that his prognosis was guarded at best, and that a reactivation of the mental illnesses might cause a breakdown of the family structure, requiring further intervention.
C.B. was returned to the family home on May 24, 1984. The Department filed a special report with the court on October 23, 1984, and a supplemental report followed. A caseworker visited the family home on October 18, 1984, and learned that the parents contemplated separation during the summer of 1984. At the end of August 1984, the mother was hospitalized because of an overdose of her medication and was unable to care for C.B. at the time of the caseworker's visit. The caseworker determined that the mother was confused, agitated, *14 and highly dependent on her husband for her own care and support after her hospitalization.
Although the parents reconciled during the mother's hospitalization for the drug overdose, the father was emotionally and mentally exhausted, severely depressed, and expressed homicidal and suicidal ideations. By his own admission, he needed to be hospitalized, and was not able to care for C.B. The father was hospitalized for psychiatric illness on four separate occasions. C.B. was placed in foster care and the supplemental report concluded that the "community provided [its] best educational, supportive and therapeutic resources but it was not sufficient to sustain this family." The Department notified the court of its intention to file a petition for the termination of parental rights, and the reports were approved by the trial court without objection.
A motion for termination of parental rights was filed on March 27, 1985. Hearings on the termination petition were held on June 19-21, July 30, and August 20, 1985. The primary witnesses at the termination hearings were the parents and the mental health professionals who had been involved in the case.

B. Evidence Presented at the Termination Hearings
Dr. Vega again testified to his diagnoses and prognoses of both parents. He conducted a psychological evaluation of the father on August 9, 1982. Dr. Vega reviewed the father's personal history, and noted that he had been married twice before. The first marriage lasted one week and the second marriage one month. The father never held a job for a significant period of time. He had a history of psychiatric episodes dating back to adolescence. Official records revealed that, as of the date of the evaluation, the father had been admitted to the State Hospital on five separate occasions. He was illiterate, and he suffered from a seizure disorder for which phenobarbital was prescribed. He had a full scale IQ of 71, the "borderline level of measured intelligence." Dr. Vega concluded that the father was capable of social and economic functioning in a low-demand environment, but that he needed support and supervision for his personal affairs, and had a borderline personality disorder.[5] Dr. Vega's prognosis for the father was that he would not significantly improve and that he was unable to provide a safe and nurturing environment for C.B. because he had minimal insight into her needs.
Dr. Vega made a separate psychological evaluation of the mother. In Dr. Vega's opinion, the mother was mildly retarded with an IQ of 63. She was unable to gain insight into her problems or identify the emotional needs of her daughter. In his opinion, she was able to meet C.B.'s physical needs only sporadically and was unable to control her impulses or maintain appropriate behavior under stress. She was also a poor candidate for therapeutic intervention because of her resistance and lack of insight. Dr. Vega concluded that the mother was not able to provide consistent emotional and physical care for C.B., and diagnosed the mother as having a "residual schizophrenic disorder (chronic)."[6] Dr. *15 Ben Green concurred in the diagnoses, and agreed that, given the parents' lengthy histories of psychological illnesses and hospitalizations, the prognoses for change or improvement were extremely poor.
Dr. Hubert Thomason testified and recommended the termination of the parent-child relationship despite his previous recommendation for reuniting the family. His opinion was predicated on a hypothetical question which assumed the psychiatric decompensation[7] of the mother in August 1984 and of the father in October 1984.[8] Dr. Thomason stated that the periodic decompensation of the parents would have a negative effect on the child.
Dr. Lawrence E. Austin was the attending psychiatrist for both the parents when they were hospitalized in the summer and fall of 1984. Dr. Austin testified that the mother's psychotic episode was characterized by disorganized thought, disheveled appearance, auditory hallucinations, and significant judgment difficulties. In his opinion, the father's illness was similar but the predominant feature of his decompensation was a desire to commit suicide because "he was so pained in the world in which he lived...." Dr. Austin testified that the odds were overwhelming that the parents would require future hospitalization for acute psychotic decompensation.
Betty Ann Gardner, a caseworker with the Department, testified that the treatment plan had not been successful overall. Although there was some compliance with the provisions of the plan, the main objectives of stabilizing the parents' marriage and their mental illnesses remained unrealized.
At the hearing the mother maintained that there were no problems with her marriage or parenting skills, and denied some of the factual observations made by Dr. Green in his testimony. The father testified that his hospitalization was due to marital problems and was not precipitated by C.B.'s presence in the home. His testimony also tended to show that he repeatedly sought help from community support services when he needed it.
On the basis of four and one-half days of testimony, the trial court found by clear and convincing evidence that the parents suffered from emotional and mental illness of such nature and duration as to render them unlikely within a reasonable time to be able to care for the ongoing physical, mental, and emotional needs of C.B., and that the parents' condition was unlikely to change within a reasonable time. The court determined that the best interest of the child required the termination of the parent-child legal relationship, and that C.B. be placed for adoption.

II.

Sufficiency of the Evidence
The parents contend that the evidence was insufficient to support the order terminating their parental rights. We disagree.
Termination of the relationship between parent and child is governed by the Parent-Child Legal Relationship Termination Act of 1977, sections 19-11-101 to -110, 8B C.R.S. (1986) (the Act). Section 19-11-105 of the Act sets forth the criteria for termination and provides in pertinent part:

*16 (1) The court may order a termination of the parent-child legal relationship upon the finding ... of the following:
....
(b) That the child is adjudicated dependent and neglected and all of the following exist:
(I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful or that the court has previously found, pursuant to section 19-3-111(e), that an appropriate treatment plan could not be devised;
(II) That the parent is unfit;

(III) That the conduct or condition of the parents is unlikely to change within a reasonable time.

(Emphasis added.)
In determining the unfitness, conduct or condition of the parents, the trial court is directed to find that the "continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care." § 19-11-105(2), 8B C.R.S. (1986). In making the determinations required by subsection (2), the court must consider a number of circumstances, including:
(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental and emotional needs of the child;
....
(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents.
§ 19-11-105(2)(a), (i), 8B C.R.S. (1986). In considering any of the factors listed in subsection (2), "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child." § 19-11-105(3), 8B C.R.S. (1986). The three criteria essential to the termination of the parent-child legal relationship, section 19-11-105(1)(b)(I-III), 8B C.R.S. (1986), must be established by clear and convincing evidence. People ex rel. A.M.D., 648 P.2d 625 (Colo.1982).
In this case, the parents stipulated that sufficient evidence existed to prove that C.B.'s environment was injurious to her welfare and the trial court accepted the stipulation and adjudicated C.B. a dependent and neglected child. § 19-1-103(1), (20), 8B C.R.S. (1986). The threshold requirement under section 19-11-105(1)(b) of the Act therefore was satisfied. See People ex rel. J.F., 672 P.2d 544 (Colo.App. 1983).
Although the original and updated treatment plans were complied with to a large extent, the evidence was virtually uncontroverted that the main objectives of stabilizing the parents' marriage and mental illnesses remained unrealized. There was clear and convincing evidence that the treatment plans had not been successful. § 19-11-105(1)(b)(I), 8B C.R.S. (1986). The unfitness of the parents, and the chronic and persistent nature of their mental illnesses, were also established by clear and convincing evidence. § 19-11-105(1)(b)(II-III), (2)(a), 8B C.R.S. (1986). The community mental health organizations and child care agencies of Pueblo County attempted to stabilize the situation for over two years without marked success, § 19-11-105(2)(i), 8B C.R.S. (1986), and the trial court was concerned with the detrimental effect of the parents' psychotic episodes on C.B., § 19-11-105(3), 8B C.R.S. (1986). The trial court's termination order is fully supported by the record and will not be disturbed on appeal. See People ex rel. L.D., 671 P.2d 940 (Colo.1983) (trial court properly found parents to be unfit based on evidence of emotional illness of parents and evidence that reasonable efforts of the department of social services failed to rehabilitate parents).

III.

The Constitutionality of Section 19-11-105(2)(a)
The parents claim that section 19-11-105(2)(a) of the Act violates the Equal Protection *17 Clause of the fourteenth amendment because it permits the termination of parental rights on the basis of mental illness. U.S. Const., amend. XIV. We disagree.
In order to challenge a law on equal protection grounds, the claimant "must be able to demonstrate that the law classifies persons in some manner." J. Nowak, R. Rotunda & J. Young, Constitutional Law 600 (2d ed. 1983). The Equal Protection Clause comes into question only when a law "has a special impact on less than all the persons subject to its jurisdiction," Board of County Commissioners v. Flickinger, 687 P.2d 975, 982 (Colo.1984) (citing New York City Transit Authority v. Beazer, 440 U.S. 568, 587-88, 99 S.Ct. 1355, 1366-67, 59 L.Ed.2d 587 (1979)), and a threshold inquiry in any equal protection claim is whether persons who are in fact similarly situated are subjected to disparate treatment by governmental act. Flickinger, 687 P.2d at 982.
The Act, by its own terms, does not differentiate between mentally ill parents and all other parents for the purpose of terminating parental rights. Rather, the classification created by the statute consists of parents of adjudicated dependent and neglected children who are unfit, who have not complied with or succeeded in a court-approved treatment plan, and whose conduct is not likely to change within a reasonable time. § 19-11-105(1)(b), 8B C.R.S. (1986). A parent is unfit and suffers from a condition justifying termination if, inter alia, he or she is unable to give the child reasonable parental care. § 19-11-105(2), 8B C.R.S. (1986). In making the determination of unfitness, a trial court is required to consider mental illness of a parent that is of such a duration or nature as to render the parent unlikely, within a reasonable time, to care for the ongoing needs of the child. § 19-11-105(2)(a), 8B C.R.S. (1986). The statute permits a court to terminate the parental rights of a person who satisfies each of the foregoing requirements, and it is impermissible to terminate the rights of a parent upon a showing of mental illness without more. Compare In re Sylvia M., 82 A.D.2d 217, 83 A.D.2d 925, 443 N.Y.S.2d 214 (1981) (class created by New York statute does not include all mentally ill parents, but only those who by reason of their infirmity are unable to care for their children; difference in treatment is not between all mentally ill parents and all "sane" parents, but only between parents so mentally ill that they cannot care for their children, and all other parents, whether mentally ill or not, who can), aff'd sub nom. In re Guardianship and Custody of Nereida S., 57 N.Y.2d 636, 454 N.Y. S.2d 61, 439 N.E.2d 870 (1982), with Helvey v. Rednour, 86 Ill.App.3d 154, 41 Ill.Dec. 671, 408 N.E.2d 17 (1980) (Illinois statute dispensing with consent of adjudicated incompetent parents who will not improve in the foreseeable future, without a showing of unfitness, violates equal protection because the presumption that all such parents are unfit is not narrowly tailored or necessary to achieve the government's compelling interests).
Here, the parents concede that the state may terminate the parental rights of unfit parents. See Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972); Helvey v. Rednour, 86 Ill. App.3d at 158, 41 Ill.Dec. at 675, 408 N.E.2d at 21; In the Interest of J.C., 242 Ga. 737, 738, 251 S.E.2d 299, 300 (1978), appeal dismissed, 441 U.S. 929, 99 S.Ct. 2046, 60 L.Ed.2d 657 (1979). The parents contend that their parental rights were terminated because their mental illnesses required periodic hospitalizations, and claim that the statute's application violates equal protection because no provision is made for the termination of the rights of non-mentally ill parents who require extensive hospitalization for physical maladies. We disagree with both the premise and the conclusion of the parents' argument.
To say that the parents' rights were terminated solely because of the probability of future hospitalization is to understate the evidence in the record. The expert testimony established that the presence of the child in the home was a cause of the psychotic decompensation of the parents. The trial court found by clear and convincing *18 evidence that it was stressful to C.B. to witness her parents' breakdowns, a danger that exists whether or not the parents require institutionalization.
The conclusion that a parent suffering from chronic physical illness requiring institutional care would never have his or her parental rights terminated is too broad a proposition to accept. "Long-term confinement of the parent" is a circumstance that the trial court is directed to consider in determining the fitness, conduct or condition of the parent. § 19-11-105(2)(g), 8B C.R.S. (1986). The term "confinement" is not defined, see § 19-1-103, 8B C.R.S. (1986), and does not appear to be limited to criminal confinement. Since the ultimate criterion is a parent's fitness, there is no indication that a hospitalized, physically ill parent would be treated any differently than a hospitalized, mentally ill parent. Both classes of persons are subject to the jurisdiction of the juvenile court. No legitimate equal protection issue is raised by the parents' argument.
Accordingly, the judgment of the trial court is affirmed.
NOTES
[1] We accepted jurisdiction of this appeal because of the constitutional issues relating to section 19-11-105, 8B C.R.S. (1986). See §§ 13-4-110(1)(a), 13-4-102(1)(b), 6 C.R.S. (1973).
[2] The record reflects, and the trial court found, that C.B. lived with her parents for the first eight months of her life. In June 1979, the mother was hospitalized at the Colorado State Hospital, and the father had difficulty in coping with and caring for C.B. The parents requested assistance from the Department and C.B. was voluntarily placed in foster care for four months. She was returned to the custody of her parents and remained at home for the next sixteen months.

The parents experienced marital difficulties in January 1981, when C.B. was twenty-seven months old. A separation occurred and the mother was hospitalized again for psychiatric reasons. The parents consented to the Department's custody of C.B. from January 30 to March 26, 1981. When she returned to her parents' home, C.B. was twenty-nine months old. She remained in the custody of her parents until June 1982.
[3] On June 4, 1982, the parents sold their car for $75 "so they could go out drinking and have a good time." C.B. went with her parents to a bar because a baby-sitter was not available. C.B. wet her pants at the bar and was taken home. The father became angry and "pushed C.B. around" because she did not assist in undressing herself. The mother became upset at L.B.'s treatment of their daughter. She responded by taking an overdose of medication and by attempting to cut her wrists. She sought and was refused admission to the Spanish Peaks Mental Health Center.
[4] C.B. was evaluated by Dr. Vera Fahlberg. Dr. Fahlberg concluded that although C.B. had made significant progress while in foster care in terms of weight gain and developmental abilities, her language and general knowledge skills were below those of her age level. Dr. Fahlberg concluded that C.B. was in need of more "planned stimulation" than the average child.

The parents attended twenty-four of twenty-eight scheduled parenting classes. The instructors reported that the father had limited insight into the needs of C.B., but that the mother's personal needs and deficits were so great that she was unable to focus on any skills that would improve her parenting.
The parents attended nine counseling sessions for couples with Jose Solis, a social worker at Spanish Peaks Mental Health Center. Solis reviewed the history of the parents, noting that both of the parents had difficulty in their relationship "due mainly to their low mental, psychological and social functioning." Solis gave a "poor prognosis for the future development of the necessary interpersonal and coping skills to make [the parents] adequate caretakers for C.B."
[5] A "borderline personality disorder" is a term of art in the fields of psychology and psychiatry and is defined as:

Borderline Personality Disorder
The essential feature is a Personality Disorder... in which there is instability in a variety of areas, including interpersonal behavior, mood, and self-image. No single feature is invariably present. Interpersonal relations are often intense and unstable, with marked shifts of attitude over time. Frequently there is impulsive and unpredictable behavior that is potentially physically self-damaging. Mood is often unstable, with marked shifts from a normal mood to a dysphoric mood or with inappropriate, intense anger or lack of control of anger. A profound identity disturbance may be manifested by uncertainty about several issues relating to identity, such as self-image, gender identity, or long-term goals or values. There may be problems tolerating being alone, and chronic feelings of emptiness or boredom.
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 321 (3d ed. 1980) (DSM-III). In making his diagnosis, Dr. Vega cited to and relied upon the DSM-III.
[6] A person is diagnosed as having a "residual schizophrenic disorder (chronic)" when:

[T]here has been at least one episode of Schizophrenia but the clinical picture that occasioned the evaluation or admission to clinical care is without prominent psychotic symptoms, though signs of the illness persist. Emotional blunting, social withdrawal, eccentric behavior, illogical thinking and loosening of associations are common. If delusions or hallucinations are present, they are not prominent and are not accompanied by strong affect.
The course of this type is either chronic or subchronic, since "acute exacerbation" by definition, involves prominent psychotic symptoms, and "in remission" implies no signs of the illness.
DSM-III, at 192.
[7] Decompensation is defined as the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms." Stedman's Medical Dictionary 366 (24th ed. 1982).
[8] Dr. Thomason's opinion was based on a hypothetical question because he examined the parents before they decompensated in August-October 1984, and he was unaware of their condition at that time.