COLORADO COURT OF APPEALS                                    2016COA167

Court of Appeals No. 14CA2423
Pueblo County District Court No. 12CV740
Honorable David W. Crockenberg, Judge

Estate of Michael Dean Casper, by and through Nick Casper, personal
representative,

Plaintiff-Appellee,

v.

Guarantee Trust Life Insurance Company, an Illinois corporation,

Defendant-Appellant.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE HARRIS
Webb and Ashby, JJ., concur

Announced November 17, 2016

Levin Rosenberg PC, Bradley A. Levin, Nelson A. Waneka, Denver, Colorado;
Keating Wagner Polidori Free PC, Zachary C. Warzel, Denver, Colorado, for
Plaintiff-Appellee

Hall & Evans, LLC, Kevin E. O'Brien, Alan Epstein, Malcolm S. Mead, Cristin J.
Mack, Denver, Colorado, for Defendant-Appellant

¶ 1    Under Colorado law, the death of a plaintiff in a personal injury action extinguishes his entitlement to recover noneconomic and punitive damages.  But what happens when the plaintiff dies after those damages have been awarded by a jury but before the district court has entered a judgment?  This question had never been answered in Colorado.

¶ 2    Michael Dean Casper bought a cancer insurance policy from defendant, Guarantee Trust Life Insurance Company (GTL); when he was diagnosed with cancer seven months later, GTL refused to pay his claims.  Casper sued GTL for breach of contract, bad faith breach of an insurance contract, and statutory unreasonable denial of benefits.  A jury awarded him more than $4,500,000 in punitive and other noneconomic damages.

¶ 3    The trial court immediately entered an oral order making the verdict a judgment.  But Casper died nine days later, before the court had reduced its oral order entering judgment to a written judgment as required by C.R.C.P. 58.  After resolving attorney fees and interest issues, the court entered a signed and dated written judgment in favor of plaintiff, the Estate of Michael Dean Casper

1

(the Estate), in the amount of $1,997,996.40, nunc pro tunc to the date of verdict.

¶ 4     GTL says that as a matter of law the delay in entering the written judgment means that under the Colorado survival statute, § 13-20-101, C.R.S. 2016, the Estate is entitled only to the $50,000 awarded as economic damages for the breach of contract claim. We disagree. Because the verdict resolved the merits of the case, and judgment would necessarily follow, the survival statute did not extinguish Casper's right to damages. We therefore affirm the judgment.

## I.  Background

¶ 5     Casper bought a "First Diagnosis" cancer insurance policy in August 2010. According to his testimony, he was sold the policy by Joanna Gaylord, a door-to-door insurance salesperson who worked for Platinum Supplemental Insurance, Inc. (Platinum), an agency with exclusive rights to sell GTL's policy. Casper listened to Gaylord's presentation but expressed concern about his ability to qualify for benefits, based on prior arterial blockages in his legs. Gaylord assured him that, as long as he had not been diagnosed with, or been advised to seek treatment for, AIDS, cancer, a heart

2

attack, or a stroke, he would be covered by the policy. Casper answered truthfully that he had not been diagnosed with or advised to seek treatment for any of those conditions. He filled out the application, authorized GTL to obtain ten years' of medical records, and agreed to monthly electronic premium payments. A month later, GTL approved his application.

¶ 6    In March 2011, Casper was diagnosed with prostate cancer. He submitted claims to GTL, which denied them. According to page twelve of the policy, cancer was not a covered condition "when advice or treatment is received . . . prior to the Effective Date, and such advice or treatment results in the First Diagnosis of Cancer." GTL maintained that Casper had received such advice, in connection with his treatment for a non-cancerous condition involving an enlarged prostate, which had ultimately resulted in the detection of Casper's prostate cancer.

¶ 7    In 2012, Casper sued GTL for breach of contract, bad faith breach of insurance contract, and unreasonable denial of benefits in violation of sections 10-3-1115 and -1116, C.R.S. 2016. He also sued, but then settled with, Gaylord and Platinum on claims for

3

negligent misrepresentation and fraud based on their role in marketing the policy on behalf of GTL.

¶ 8    Trial was originally scheduled to begin in February 2014.  But in October 2013, the court, on its own motion, reset the trial to July 2014.

¶ 9    During trial, the court directed a verdict for Casper on his breach of contract claim, finding that the exclusion provision was ambiguous and, therefore, as a matter of law, the policy had to be construed as covering Casper's cancer.  On July 15, 2014, the jury returned a verdict in favor of Casper on all claims.  It awarded Casper $50,000 for breach of contract, $50,000 for unreasonable denial of benefits, $150,000 in economic damages for bad faith breach of the contract, $550,000 in noneconomic damages for bad faith breach of the contract, and $4,000,000 in punitive damages.[1]

¶ 10    Because Casper was in hospice care by then, his lawyer requested that the court immediately enter judgment on the verdict to avoid any limitation on recovery under Colorado's survival

---

[1] The parties later agreed that the economic damages awards for the breach of contract, bad faith breach of an insurance contract, and statutory unreasonable denial of benefits claims were duplicative and that economic damages totaled $50,000.

4

statute. The court attempted to oblige, announcing that it was entering judgment. It directed the clerk to receive and enter the verdict in the court registry. Then it entered an unsigned minute order reflecting that it had ordered judgment to be entered.

¶ 11 When Casper died nine days later, GTL moved to set aside the verdict in part and to limit the recoverable damages. It argued that because attorney fees and prejudgment interest had not been determined and statutory caps had not been applied, Casper had died before final judgment had been entered. Thus, according to GTL, the statutory bad faith denial of benefits claim was extinguished, as was Casper's entitlement to recover noneconomic and punitive damages. GTL requested that the court enter final judgment on the breach of contract claim in the amount of $50,000. In the alternative, GTL requested that the court impose statutory caps on the noneconomic and punitive damages.

¶ 12 Casper's attorneys, in the meantime, moved to substitute the Estate as plaintiff, and then they requested an award of attorney fees under section 10-3-1116 and prejudgment interest to July 15, 2014, the date the court had orally entered judgment.

¶ 13    The district court denied GTL's motion to set aside the verdict, ruling that the survival statute was not implicated because Casper had died after entry of judgment on the verdict.  It did, however, grant GTL's motion to enforce the statutory caps on damages.

¶ 14    On October 30, 2014, after reducing the noneconomic and punitive damages pursuant to statutory caps and awarding approximately one-third of the fees requested by Casper's attorneys, the district court entered an amended final judgment, nunc pro tunc to July 15, 2014, in favor of the Estate in the amount of $1,997,996.40.

¶ 15    On appeal, GTL contends that the district court erred by failing to vacate all of the damages (with the exception of the $50,000 breach of contract damages), by characterizing the attorney fees awarded under section 10-3-1116 as compensatory damages for purposes of calculating punitive damages, by failing to further reduce the attorney fees award, and by instructing the jury on an insurance regulation related to the standard of care for the sale and marketing of insurance policies.  We take up each of these contentions, reject them, and therefore affirm.

## II. Colorado's Survival Statute

¶ 16    At common law, claims based on personal torts abated upon the death of either party.  To ameliorate the harsh effects of this rule, Colorado, like most other states, enacted a survival statute in the late 1800s.  Its current iteration — section 13-20-101 — provides:

> All causes of action, except actions for slander or libel, shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued, but punitive damages shall not be awarded nor penalties adjudged after the death of the person against whom such punitive damages or penalties are claimed; and, in tort actions based upon personal injury, the damages recoverable after the death of the person in whose favor such action has accrued shall be limited to loss of earnings and expenses sustained or incurred prior to death and shall not include damages for pain, suffering, or disfigurement, nor prospective profits or earnings after date of death.  An action under this section shall not preclude an action for wrongful death under part 2 of article 21 of this title.

¶ 17    GTL contends that because Casper died before a final, appealable judgment was entered, the Estate may recover only the $50,000 awarded as economic damages.

7

## A. Standard of Review and Principles of Interpretation

¶ 18 Resolution of this case turns on the interpretation of a statute, an issue of law subject to de novo review. *Kyle W. Larson Enters., Inc. v. Allstate Ins. Co.*, 2012 COA 160M, ¶ 9.

¶ 19 Our primary task when construing a statute is to ascertain and give effect to the legislature's intent based on its chosen language. *Young v. Brighton Sch. Dist. 27J*, 2014 CO 32, ¶ 11; *see also State v. Nieto*, 993 P.2d 493, 502 (Colo. 2000) ("Legislative intent is the polestar of statutory construction." (quoting *Schubert v. People*, 698 P.2d 788, 793 (Colo. 1985))). We give words and phrases their plain and ordinary meanings, and we read the statute as a whole, giving consistent, harmonious, and sensible effect to all of its parts. *Young*, ¶ 11. We must choose a construction that serves the purpose of the legislative scheme and avoids absurd results. *Town of Erie v. Eason*, 18 P.3d 1271, 1276 (Colo. 2001).

¶ 20 If the statutory language is unambiguous, we apply it as written. *Reno v. Marks*, 2015 CO 33, ¶ 20. If a statute is ambiguous, however, we may consider indicia of legislative intent such as the object to be attained, the circumstances under which the statute was enacted, the common law, and the consequences of

a particular construction.  § 2-4-203, C.R.S. 2016; *see also State Eng'r v. Castle Meadows, Inc.*, 856 P.2d 496, 504 (Colo. 1993) (listing indicators of legislative intent).  "Because we also presume that legislation is intended to have just and reasonable effects, we must construe statutes accordingly and apply them so as to ensure such results."  *Castle Meadows, Inc.*, 856 P.2d at 504; *see also* § 2-4-201(1)(c), C.R.S. 2016.

## B. Discussion

¶ 21    The survival statute sets forth a broad rule, with two exceptions.  As relevant here, all causes of action survive the death of a party.  But, neither punitive damages nor penalties shall be "awarded" or "adjudged" after the death of a party,[2] and in personal injury cases, the damages "recoverable" after the death of the

---

[2] The statute prohibits the award of punitive damages or penalties "after the death of the person *against whom* such punitive damages or penalties are claimed," § 13-20-101, C.R.S. 2016 (emphasis added), but the supreme court has interpreted this limitation on damages to apply not just when the tortfeasor dies, but also when the plaintiff dies.  *See Kruse v. McKenna*, 178 P.3d 1198, 1200 (Colo. 2008); *see also Warren v. Liberty Mut. Fire Ins. Co.*, Civ. A. No. 05-cv-01891-PAB-MEH, 2011 WL 1103160, at *9 (D. Colo. 2013 Mar. 24, 2011) (Although the statutory language appears to bar recovery of punitive damages or penalties only after the death of the tortfeasor, "[t]his interpretation of the statute . . . has been foreclosed by the Colorado Supreme Court.").

9

plaintiff are limited to economic damages suffered before death and shall not include noneconomic damages or future earnings. § 13-20-101.

¶ 22    GTL maintains that the survival statute precludes recovery of punitive or noneconomic damages if the plaintiff dies before his claims merge into a final judgment, an event that prevents abatement. And, it argues, the judgment that was entered in July 2015, days before Casper's death, was not final because it did not include an award of attorney fees or prejudgment interest. Therefore, the jury's award of damages became a nullity when extinguished by Casper's death nine days later.

¶ 23    We agree with GTL that, as a general matter, claims merge into a judgment and a judgment does not abate, even if the cause of action would not have survived the party's death. *Ahearn v. Goble*, 90 Colo. 173, 176, 7 P.2d 409, 410 (1932). And, neither the court's oral pronouncement nor the minute order constituted a "judgment" within the meaning of C.R.C.P. 58(a) because the rule requires entry of a written, dated, and signed judgment. But we do not believe that these propositions lead inexorably to a conclusion that the survival statute precludes recovery of punitive and other

noneconomic damages if the plaintiff dies after the verdict is returned but before judgment is entered. We conclude that, based on the language, history, and purpose of the statute, the legislature did not intend to draw such a bright line between verdict and judgment. Rather, in our view, one naturally leads to the other, so that a party who survives to verdict and obtains an entitlement to a judgment may recover punitive and other noneconomic damages, regardless of whether the party is alive when the resulting judgment is entered.

¶ 24     To begin, the statute does not set the date of judgment as the time when a claim for noneconomic damages is no longer subject to abatement. Nor does it mention the date of verdict. Some other states' survival statutes do explain more explicitly when the party's death extinguishes a right to recover damages. *See, e.g.*, Cal. Prob. Code § 573 (West 1991) ("Where a person having a cause of action dies before judgment, the damages recoverable . . . are limited to the loss or damage the decedent sustained or incurred prior to death, including any penalties or punitive or exemplary damages . . . but not including any damages for pain, suffering, or disfigurement.") (repealed 1992); Nev. Rev. Stat. § 41.100 (2016)

11

("[W]hen a person who has a cause of action dies before judgment, the damages recoverable by the decedent's executor . . . include all losses or damages which the decedent incurred or sustained before the decedent's death, including any penalties or punitive and exemplary damages . . . and damages for pain, suffering or disfigurement . . . ."); Or. Rev. Stat. § 121.010 (1964) ("An action for a wrong shall not abate by the death of any party, after a verdict has been given therein, but the action shall proceed thereafter in the same manner as in cases where the cause of action survives.") (repealed 1965).

¶ 25    The General Assembly's decision to forego an explicit selection of either the date of verdict or the date of judgment as the controlling date for survival purposes shows that it did not consider the distinction relevant.  The General Assembly has distinguished between the verdict and the judgment in a number of other statutes.  *See, e.g.*, § 8-2-203, C.R.S. 2016 ("[T]he verdict of the jury and the judgment of the court shall specify the amount of damages awarded to each person . . . ."); § 13-64-205, C.R.S. 2016 (setting forth the procedure to determine "what judgment is to be entered on a verdict requiring findings of special damages"); § 38-1-113, C.R.S.

12

2016 ("The court shall cause the verdict of the jury and the judgment of said court to be entered upon the records of said court."). Thus, had the General Assembly intended to bar a party's recovery of noneconomic damages in the event of death after the verdict but before judgment, it could have said so. *See Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010) ("[T]he General Assembly's failure to include particular language is a statement of legislative intent.").

¶ 26    Turning to the language that does appear in the survival statute, we conclude that it supports an interpretation that survival to verdict suffices for a party to recover noneconomic damages. With respect to punitive damages, the statute instructs that a plaintiff cannot be "awarded" punitive damages after his death or the death of the tortfeasor. Because punitive damages are awarded by the jury, an "award" of punitive damages necessarily occurs at the time of the verdict. *See* § 13-21-102, C.R.S. 2016 (jury may award exemplary damages in addition to actual damages). Accordingly, the legislature's choice of the word "awarded" indicates that a punitive damages award is not extinguished if the plaintiff dies after a verdict is returned. *See People v. Guenther*, 740 P.2d

13

971, 976 (Colo. 1987) (In construing a statute, the court assumes that the legislative choice of language is a "deliberate one calculated to obtain the result dictated by the plain meaning of the words.").

¶ 27    Though the General Assembly used another term — "recoverable" — when referring to other types of noneconomic damages, we do not read the statute as imposing different rules depending on the type of noneconomic damages at issue.  In other words, we do not believe that the legislature intended to allow a party to recover punitive damages if he survived to verdict, but to allow recovery of other noneconomic damages only if he survived to entry of judgment.  The creation of separate standards within the same provision of a statute would be unusual enough that we would expect the legislature to delineate that distinction more explicitly.  And, if the statute creates a single standard, we believe that the word "awarded" is a more clear description of the relevant event than the word "recoverable."

¶ 28    Even so, because the language could reasonably be interpreted to support both Casper and GTL, we conclude that the statute is ambiguous.  Thus, we must look to other tools of statutory construction to ascertain legislative intent.

¶ 29     Under the common law of England, causes of action did not abate upon the death of a party once a verdict was returned as long as the judgment followed within a prescribed period of time.  *See, e.g., Isley's Case* (1589) 74 Eng. Rep. 172 (K.B.) (where the plaintiff died after verdict but before judgment was entered, cause of action was not abated but instead judgment related back to date of verdict); *see also* 17 Car. 2 c. 8 (1665) ("[I]n all Actions Personall (') Reall or mixt the death of either partie betweene the Verdict and the Judgement shall not hereafter be alleadged for Error soe as such Judgement be entred within Two Termes after such Verdict."); *Skidaway Shell-Road Co. v. Brooks*, 77 Ga. 136, 138 (1886) (under English common law, return of a verdict before the death of a party prevented abatement).  In other words, because the judgment followed from the verdict, the verdict was ordinarily sufficient to prevent abatement.

¶ 30     GTL points out that while Colorado adopted the common law of England, it did not adopt statutes enacted after 1607.  *See* § 2-4-211, C.R.S. 2016.  But under the common law, as well as the pre-1607 statutes that codified it, the death of a party after verdict did not result in an abatement of the claims.

15

¶ 31    C.R.C.P. 58(a) also codifies this concept. Under the rule, "upon a general or special verdict of a jury, or upon a decision by the court, the court shall promptly prepare, date, and sign a written judgment." Rule 58(a), then, contemplates that the verdict and judgment go hand in hand. And C.R.C.P. 54(f) instructs that "[i]f a party dies after a verdict or decision upon any issue of fact, and before judgment, the court may, nevertheless, render judgment thereon." This rule confirms that, once a verdict is returned, the judgment shall follow, even if the party dies before judgment is entered. *See Bates v. Burns*, 274 P.2d 569, 570 (Utah 1954) (interpreting equivalent rule and concluding that the plaintiff's action did not abate where the plaintiff died after verdict but before judgment because purpose of rule is to "preserve the verdict until a judgment can be entered thereon").

¶ 32    A number of courts share our view that once the merits of the case have been decided by a verdict and the plaintiff is entitled to a judgment, the action or claim for damages will not abate, even if judgment has not been entered at the time of the party's death.

¶ 33    In *Tunnell v. Edwardsville Intelligencer, Inc.*, 252 N.E.2d 538 (Ill. 1969), for example, the jury returned a verdict for the plaintiff

16

on his defamation action. The court entered judgment notwithstanding the verdict for defendant and plaintiff appealed, but while the appeal was pending, the plaintiff died. After reversal by the court of appeals, the defendant objected to reinstatement of the verdict, arguing that the defamation claim did not survive the plaintiff's death. The Illinois Supreme Court disagreed, holding that an action does not abate when the plaintiff dies after obtaining a verdict in his favor:

> What is significant in such cases, in our opinion, is not any metaphysical notion of merger of the cause of action into the verdict, but rather the circumstance that all factual questions had been resolved before the plaintiff died. . . . The present case was ripe for judgment when the plaintiff died, and the appellate court properly held that his death did not abate the action.

*Id.* at 541.

¶ 34    An analogous situation arose in *Reed v. United States*, 891 F.2d 878 (11th Cir. 1990). In that case, the parents of a child who was born with birth defects asserted negligence claims against the government under the Federal Tort Claims Act. The parties reached a settlement; shortly thereafter, the lawyer for the government notified the plaintiffs that the settlement had been approved. The

following day, the government's lawyer prepared a stipulation and sent it to the plaintiffs' lawyer for signature. The child had died, however, the day before, just after the parties had confirmed approval of the settlement. The government attempted to withdraw from the settlement, contending that, under Florida's survival statute in effect at the time, the negligence action abated upon the child's death.

¶ 35    The Eleventh Circuit affirmed the district court's enforcement of the agreement. It reasoned that the period between settlement and final judgment was similar to the period between verdict and judgment because, in both situations, the dispute had been "conclusively resolved." *Id.* at 881-82; *Variety Children's Hosp., Inc. v. Perkins*, 382 So. 2d 331 (Fla. Dist. Ct. App. 1980) (cause of action does not abate during period between verdict and judgment). The settlement entitled the plaintiffs to a judgment and, thus, the cause of action did not abate between settlement and final judgment. *Id.* at 882; *see also Parker v. Parker*, 319 A.2d 750, 751 (N.J. Super. Ct. App. Div. 1974) (husband's death after resolution of parties' dispute but before judgment did not abate divorce action because trial court had "made a definitive adjudication of the controversy, reflecting its

18

conclusive determination that each party be granted a divorce");
*Garrett v. Byerly*, 284 P. 343, 358 (Wash. 1930) (concluding that
cause of action does not abate when party dies after the verdict
because party is "entitled to a judgment" at the time of his death
(quoting *Fitzgerald v. Stewart*, 53 Pa. 343, 346 (1866))); *Wilson v.
Coop. Transit Co.*, 30 S.E.2d 749, 753 (W. Va. 1944) (negligence
claim did not abate where the plaintiff died after verdict but before
entry of judgment).

¶ 36     Undaunted, GTL contends that Casper was not entitled to a
"final judgment" at the time of his death because the court had not
yet computed attorney fees and prejudgment interest.  To be sure,
when attorney fees and prejudgment interest constitute
compensatory damages — as they do in this case — a final,
appealable judgment cannot be entered until the calculations are
complete.  *See Grand Cty. Custom Homebuilding, LLC v. Bell*, 148
P.3d 398, 400-01 (Colo. App. 2006).  But that does not mean that
the court could not enter a judgment pursuant to C.R.C.P. 58(a)
before it performed the calculations necessary to enter an amended
judgment that would be final and appealable under C.R.C.P. 54(a).
A "final judgment" is simply a type of judgment from which an

appeal may lie. *See* C.R.C.P. 54(a) ("'Judgment' as used in these rules includes a decree and order to or from which an appeal lies."); C.R.C.P. 58 ("The term 'judgment' includes an appealable decree or order as set forth in C.R.C.P. 54(a)."); *see also Musick v. Woznicki,* 136 P.3d 244, 251 (Colo. 2006) (distinguishing judgments from final, appealable judgments under C.R.C.P. 54); *cf. In re Estate of Becker,* 32 P.3d 557, 559-60 (Colo. App. 2000) (judgment in dissolution of marriage case could have been entered after initial hearing, even though court had not yet ruled on child custody issues). We therefore reject GTL's argument that Casper's claim abated merely because he was not entitled to a final, appealable judgment.

¶ 37     Here, entry of judgment under C.R.C.P. 58(a) was surely proper, as the jury had returned a general verdict. Indeed, the dispute had been fully and finally resolved, all issues of liability had been determined, and the jury had awarded all damages based on the evidence presented at trial. *See, e.g., Kaufman v. Herrman,* 748 So. 2d 310, 312 (Fla. Dist. Ct. App. 1999) (The personal injury action did not abate upon death of the plaintiff before entry of judgment because the "dispute in this case had been conclusively

decided in favor of [plaintiff] by the rendition of the verdict prior to [plaintiff's] death.").[3]

¶ 38    In any event, we are not persuaded that the General Assembly intended the extinguishment of a jury verdict to turn on whether attorney fees are characterized as costs or compensatory damages, particularly where the legislature itself created the special remedy that allows for reimbursement of attorney fees.  Under GTL's reasoning, its own egregious conduct in unreasonably denying benefits (which turns attorney fees otherwise treated as costs into compensatory damages) would cause the delay that then renders the jury's award of noneconomic damages unrecoverable.  We

---

[3] The Estate contends that, not only was it entitled to a judgment after the jury verdict under C.R.C.P. 58, but that judgment was actually entered at this time because, when the court entered its later written judgment, it did so nunc pro tunc to the date of the verdict.  "Nunc pro tunc judgments operate retrospectively and are given the same force and effect as if entered at the time the court's decision was originally rendered."  *Dill v. County Court*, 37 Colo. App. 75, 76 541 P.2d 1272, 1273 (1975).  However, a court may only enter a judgment nunc pro tunc to a date on which the judgment legally could have entered.  *Robbins v. A.B. Goldberg*, 185 P.3d 794, 797 (Colo. 2008).  Because we conclude that the judgment legally could have entered on the date of the verdict, we agree with the Estate that judgment was validly entered nunc pro tunc to that date.  But this conclusion is not necessary to the resolution of the Estate's claim: even if the court had not entered the judgment nunc pro tunc, Casper's claim would not have abated because he was entitled to a judgment.

21

decline to read the survival statute to require that result. *Castle Meadows, Inc.*, 856 P.2d at 504 (court should construe a statute in a way that promotes the just and reasonable result the legislature surely intended).

¶ 39 Finally, our interpretation of the statute advances its overall goal of preserving claims and remedies. GTL says that we should construe the statute in favor of abatement. But the supreme court has explained that the statute indicates "an intention to *create* remedies rather than to kill or suppress them." *Publix Cab Co. v. Colo. Nat'l Bank of Denver*, 139 Colo. 205, 220, 338 P.2d 702, 710 (1959).

¶ 40 For these reasons, we conclude that the claims for noneconomic damages, including punitive damages, did not abate upon Casper's death.

III. Attorney Fees and Costs Under Section 10-3-1116

¶ 41 Under section 13-21-102(1)(a), the amount of "actual damages" awarded to a plaintiff determines the amount of punitive damages the plaintiff may recover. GTL asserts that attorney fees and costs awarded by the trial court under section 10-3-1116 do not constitute actual damages. Thus, GTL contends that the

district court erred when calculating both actual and punitive damages. We disagree.

## A. Standard of Review

¶ 42     Although we typically review a district court's decision to award attorney fees for an abuse of discretion, we review the legal conclusions that provided the basis for that decision de novo. *Jorgensen v. Colo. Rural Props., LLC*, 226 P.3d 1255, 1259 (Colo. App. 2010); *see also Sch. Dist. No. 12 v. Sec. Life of Denver Ins. Co.*, 185 P.3d 781, 787 (Colo. 2008). And because the district court awarded attorney fees pursuant to section 10-3-1116(1), we also review its interpretation of this statute de novo. *Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 969 (Colo. App. 2011).

¶ 43     Our ultimate task when examining statutes is to give effect to the intent of the legislature, as expressed through the plain language of the statute. *Kyle W. Larson Enters., Inc.*, ¶ 10. Even so, we may still examine legislative history when there is substantial legislative discussion that bolsters our plain language interpretation. *Kisselman*, 292 P.3d at 972; *see Welby Gardens v. Adams Cty. Bd. of Equalization*, 71 P.3d 992, 995 (Colo. 2003)

(discussing legislative history despite concluding that "the plain language of the statute is clear").

## B. Discussion

¶ 44 Pursuant to section 10-3-1116, the district court awarded attorney fees and costs as part of the Estate's actual damages. Relying on *Hall v. American Standard Insurance Co. of Wisconsin,* 2012 COA 201, which determined that attorney fees are damages (but did not specify whether they were actual, i.e., compensatory, damages), the district court concluded that attorney fees and costs were a component of actual damages and not a penalty, as GTL asserted.

¶ 45 We agree with the district court and conclude that under the plain meaning of section 10-3-1116, reasonable attorney fees and court costs in this context are actual damages and do not constitute penalties or other types of damages. *Hall,* ¶ 20. Although *Hall* does not explicitly say that such damages constitute "actual damages," we find *Hall*'s analysis and reasoning lead to that conclusion.

¶ 46 Section 10-3-1116, which became effective August 5, 2008, concerns "[r]emedies for unreasonable delay or denial of [insurance] benefits." The language provides, in pertinent part, that "[a] first-

24

party claimant . . . whose claim for payment of benefits has been unreasonably delayed or denied may bring an action . . . to recover reasonable attorney fees and court costs and two times the covered benefit." § 10-3-1116(1); *Kisselman*, 292 P.3d at 967. Additionally, subsection (4) provides that the "action authorized in this section is in addition to, and does not limit or affect, other actions available by statute or common law, now or in the future." § 10-3-1116(4).

¶ 47 The plain language of the statute lists two components of recovery: "reasonable attorney fees and court costs" and "two times the covered benefit." § 10-3-1116(1); *see also Hall*, ¶ 20. Unlike other statutes permitting the recovery of attorney fees, such as sections 13-40-123, 24-34-402.5(2)(b)(I), and 38-33.3-123(1)(c), C.R.S. 2016, section 10-3-1116 does not separate or place in a distinct subsection the provision providing for the recovery of attorney fees and costs. *Hall*, ¶¶ 13, 20. This structure evinces the legislature's intent to make the award of attorney fees and costs a primary remedy, and not an additional or ancillary remedy. *See id.*; *compare* § 13-40-123 (separating and distinguishing attorney fees and costs from other "recover[able] damages"), *with* § 10-3-1116(1)

25

(listing nothing to recover other than "reasonable attorney fees and court costs and two times the covered benefit").

¶ 48     Further, "[c]lassification of attorney fees as either costs or damages depends on context, and turns on the nature of the requested attorney fees in a particular case." *Hall*, ¶ 15. When attorney fees and costs are part of the substance of the lawsuit, that is, when they are the "legitimate consequences" of the tort or breach of contract sued upon, attorney fees are clearly damages. *Id.* at ¶¶ 15, 20 (quoting *Ferrell v. Glenwood Brokers, Ltd.*, 848 P.2d 936, 941 (Colo. 1993)). Accordingly, we agree with *Hall*'s conclusion that attorney fees and costs are "a 'legitimate consequence' of bringing. . . an action to remedy an insurer's unreasonable conduct" and that this interpretation "is consistent with the statutory authorization" in section 10-3-1116. *Id.* at ¶ 20; *see also Stresscon Corp. v. Travelers Prop. Cas. Co. of Am.*, 2013 COA 131, ¶¶ 119-20 (relying on *Hall* to conclude attorney fees are damages under section 10-3-1116), *rev'd on other grounds*, 2016 CO 22M. Thus, under section 10-3-1116, attorney fees and costs are actual damages. *Cf. Bunnett v. Smallwood*, 793 P.2d 157, 160 (Colo. 1990) (Attorney fees are not considered "actual damages" when "they are

26

not the legitimate consequences of the tort or breach of contract sued upon." (quoting *Taxpayers for the Animas-LaPlata Referendum v. Animas-LaPlata Water Conservancy Dist.*, 739 F.2d 1472, 1480 (10th Cir. 1984))); *see Ferrell*, 848 P.2d at 941-42 (attorney fees should be considered actual damages when they are part of the substance of the lawsuit); *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 150 (Colo. App. 2003) (Attorney fees are actual damages when "but for defendants' obdurate conduct, plaintiff would not have incurred attorney fees in pursuing its judgment.").

¶ 49    True enough, this interpretation of section 10-3-1116 is a departure from the common law rule that attorney fees are not recoverable as damages for a first-party insurance bad faith claim. *See Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285 (Colo. 1996). But when the General Assembly enacted this statute it created "a new private right of action for insureds in addition to and different from a common law bad faith claim." *Kisselman*, 292 P.3d at 975. In stating that the "action authorized in this section is in addition to . . . other actions available by statute or common law," § 10-3-1116(4), the statute makes clear that it imposes upon insurers

additional liabilities and provides for additional means of recovery for plaintiffs. *See Kisselman*, 292 P.3d at 972-73.

¶ 50     Despite this language, GTL contends that *Bernhard* should control, and to hold otherwise would create a conflict between *Bernhard* and the statute. We perceive no conflict.

¶ 51     While, under *Bernhard,* attorney fees in this case would not be considered actual damages, it is axiomatic that the legislature can, and frequently has, abrogated various common law tort doctrines. *Union Pac. R.R. Co. v. Martin*, 209 P.3d 185, 187 (Colo. 2009); *see, e.g., Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1176 (Colo. 1993) (recognizing the legislature's abrogation of the common law rule that the release of one tortfeasor operated to release all tortfeasors from liability for the same tort).

¶ 52     Section 10-3-1116 was enacted nearly twelve years after *Bernhard* was announced; *Bernhard* simply has no bearing on how attorney fees should be treated under a later-enacted statute that explicitly departs from the common law. And the court in *Bernhard* expressly recognized that deviations from the common law rule preventing the recovery of attorney fees as damages could be properly established by the legislature; it merely concluded that at

that time — before the enactment of section 10-3-1116 — the legislature had not yet created such an exception. 915 P.2d at 1288 ("Permitting Bernhard to recover attorney fees would represent the creation of a new exception to the American rule: a function better addressed by the legislative than the judicial branch of government.").

¶ 53 Thus, because section 10-3-1116 created a new statutory right of action separate and apart from common law bad faith claims, *Bernhard*, which discusses common law bad faith claims, is not dispositive. *Kisselman*, 292 P.3d at 975; *see also Vaccaro v. Am. Family Ins. Grp.*, 2012 COA 9M, ¶ 35 ("As the *Kisselman* division observed, common law bad faith precedent is helpful, but not dispositive, when interpreting a statutory right of action expressly intended to apply 'in addition to . . . other actions available by statute or common law.'" (quoting § 10-3-1116(4))).

¶ 54 Moreover, following *Bernhard* would be contrary to the clear intent of the legislature. Section 10-3-1116 expanded the causes of action against insurance companies and provided for additional remedies. *Kisselman*, 292 P.3d at 972-73. It is clear from both the plain meaning of the statute and the legislative history behind it

that the legislature intended to carve out exceptions to the common law, including an exception to the common law rule that attorney fees were not recoverable as actual damages. *Id.*; *see* § 10-3-1116(1). The legislature made clear that insureds should not be forced to sue their insurers to obtain the benefit of their bargain. Thus, the General Assembly departed from the common law to enact new protections for individuals that would permit the recovery of reasonable attorney fees and court costs as actual damages. *See Kisselman,* 292 P.3d at 972-73.

¶ 55 GTL further contends that, even if *Bernhard* does not control, attorney fees and costs are a penalty, and not damages, because section 10-3-1116 is penal in nature. Thus, GTL argues, attorney fees and costs cannot be included in the calculation of actual damages.

¶ 56 But we disagree that the statute is penal and instead conclude that section 10-3-1116 is remedial in nature. *See Stresscon Corp.,* ¶ 121. In *Stresscon,* a division of this court determined that the attorney fees under section 10-3-1116 were damages, not costs, and "this request for damages is part of a remedial statutory scheme." *Id.* at ¶ 121. After examining the legislative history and

comparing the statute to other similar statutory schemes, the division concluded that "section 10-3-1116 was enacted as a remedial measure, intended 'to curb perceived abuses in the insurance industry.'" *Id.* at ¶ 124 (quoting *Kisselman*, 292 P.3d at 976). Thus, the fee-shifting component of the statute has a "compensatory purpose" and is not a penalty. *Id.* at ¶ 122.

¶ 57    Even assuming some aspect of the statute is penal, GTL's argument is too broad: statutes may be both remedial and penal in nature. *See Moeller v. Colo. Real Estate Comm'n*, 759 P.2d 697, 701 (Colo. 1988). Although section 10-3-1116 may be penal in the sense that the General Assembly intended for it to punish insurance companies and deter them from unreasonably denying the claims of their insureds, *see Kisselman*, 292 P.3d at 972, the penal nature of the statute only manifests itself in the ability to recover two times the amount of the covered benefit. *See Gerald H. Phipps, Inc. v. Travelers Prop. Cas. Co. of Am.*, Civ. A. No. 14-CV-01642-PAB-KLM, 2015 WL 5047640, at *2 (D. Colo. Aug. 27, 2015) (noting that the ability to recover "two times the covered benefit . . . reflects the imposition of a penalty"). But this double recovery has no bearing on whether the attorney fees and costs are a penalty and

therefore not actual damages. *Cf. Moeller*, 759 P.2d at 701 ("When a statute is both remedial and penal in nature, the remedial and penal elements are separated and the appropriate standard is applied to each.").

¶ 58 Although section 10-3-1116 does not explicitly label attorney fees and costs as "actual damages," we conclude that the statute intended to classify them as actual or compensatory damages. Thus, the district court did not err in its calculation of both actual and punitive damages.

## IV. Supplemental Award of Attorney Fees and Costs

¶ 59 GTL next asserts that the district court erred by not reducing by two-thirds the supplemental request for attorney fees. We disagree.

## A. Additional Background

¶ 60 Casper's attorneys filed two requests for fees. In their first motion, they sought $396,180 in fees, plus a lodestar enhancement of fifty percent, for a total of $594,270, as well as costs in the amount of $57,840.55. They later filed a supplemental fee request, seeking an additional $123,925 in post-trial fees and $15,105.24 in costs.

¶ 61    GTL opposed both fee requests.  Regarding the initial fee request, GTL asserted that no fees were recoverable, but, at most, Casper's lawyers could recover only those fees attributable to the statutory unreasonable denial of benefits claim, without any lodestar enhancement.  GTL attached an affidavit from an expert, who recommended that the court award no more than $75,000 in fees.

¶ 62    GTL made the same apportionment argument with respect to the supplemental fee request and attached an exhibit that set forth its objections to specific time entries.  It identified numerous entries that it claimed were attributable to work on a related probate matter, but it only identified two entries as being otherwise unrelated to the statutory claim, and those entries amounted to approximately $800 in fees.  It did not provide an expert affidavit related to apportionment or reasonableness of the supplemental fee request.

¶ 63    The hearing on attorney fees was conducted by telephone and neither party called any witnesses or introduced any evidence beyond the expert affidavits that had previously been submitted by both parties.  Casper's lawyers reiterated their request for fees plus

a fifty percent lodestar enhancement, and GTL reiterated its request that the court award only those fees attributable to the statutory claim, though it did not suggest any particular percentage or amount. At the hearing, GTL did not reassert its specific objections to the time entries or protest that the vagueness of the entries prevented additional specific objections.

¶ 64 The court determined that, as a rough estimate, only one-third of the fees in the initial request were attributable to the statutory bad faith claim. It denied Casper's lawyers a fifty percent lodestar enhancement and instead applied a twenty percent enhancement to the reduced fee amount. As for the supplemental fees, the court examined the time entries, concluded that — with the exception of work on the probate case — the entries related to the statutory bad faith claim, and approved the remaining fees. After those reductions, the attorney fee award totaled $281,197, a sixty percent overall decrease from the request of approximately $718,000 ($594,270 in the initial motion for fees plus the $123,925 requested in the supplemental motion).

¶ 65 On appeal, GTL contends that the district court erred in awarding all of the fees requested in the supplemental fee request,

34

insisting that the court should have reduced the overall request of $123,925 by two-thirds. It specifically objects to the award of fees related to the motion to amend the judgment and research on abatement, which GTL says were matters unrelated to the statutory claim.

## B. Standard of Review

¶ 66    The determination of what constitutes reasonable attorney fees is a question of fact for the trial court and will not be disturbed on review unless it is patently erroneous and unsupported by the evidence. *Melssen v. Auto-Owners Ins. Co.*, 2012 COA 102, ¶ 67; *see also Planning Partners Int'l, LLC v. QED, Inc.*, 2013 CO 43, ¶ 12. We therefore review the reasonableness of the amount of attorney fees awarded for an abuse of discretion. *Melssen*, ¶ 67.

## C. Discussion

¶ 67    The parties disagree as to whether apportionment of fees is necessary in this case. GTL maintains that the court could award fees only for work directly related to the statutory unreasonable denial of benefits claim. The Estate, however, argues that apportionment is not required under section 10-3-1116 and that, in any event, Casper's statutory claim was intertwined with the

35

common law claim, rendering apportionment unnecessary. We need not resolve this dispute because we determine that, even if apportionment was required, the district court did not clearly err in its award of supplemental fees.

¶ 68 GTL did not request a two-thirds reduction in the supplemental fees until after the court had reduced the initial request for fees by two-thirds. Indeed, it never suggested any percentage reduction based on an apportionment theory. Its argument, then, is simply that the court was required to apportion the supplemental fees in precisely the same manner as the initial fees. We discern no such requirement.

¶ 69 Rather than applying a rough, across-the-board reduction in fees, as it had with the primary motion for attorney fees, the district court examined the entries included in the supplemental fee petition and the parties' related exhibits to determine whether those entries were sufficiently related to the statutory claim. We perceive no abuse of discretion in the use of this more precise methodology for apportionment. *See Planning Partners*, ¶ 23 ("'[T]here is no precise rule or formula' for determining attorney's fees." (quoting *Evans v. Jeff D.*, 475 U.S. 717, 736 (1986))); *cf. Haystack Ranch,*

36

*LLC v. Fazzio*, 997 P.2d 548, 557 (Colo. 2000) (observing that because the trial court made no attempt to parse the billing statements and timesheets, the allocation was unsupported by the evidence).

¶ 70    That leaves GTL's specific objections to two time entries: work related to (a portion of) the motion to amend the judgment and research concerning abatement.  GTL did not object to Casper's lawyers' recovery of their fees for research on abatement until after the court had issued its order on attorney fees.  But even if it had made an earlier objection, the district court did not clearly err in determining that research on abatement of claims was related to Casper's statutory bad faith claim.  GTL's motion to set aside the verdict argued that Casper's statutory claim had abated upon his death.  Research conducted in response to that argument would relate to the statutory claim.  As for the motion to amend the judgment, GTL concedes that at least some portion of the motion was attributable to that claim.  Even where apportionment is warranted, we do not require the kind of surgical precision demanded by GTL.  The trial court's goal when awarding attorney fees and costs "is to do rough justice, not to achieve auditing

37

perfection." *Payan v. Nash Finch Co.*, 2012 COA 135M, ¶ 35 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

¶ 71    Furthermore, the district court's apportionment of fees resulted in an overall reduction of more than sixty percent from the amount requested.  Given that GTL did not suggest any particular apportionment method or percentage reduction, we discern no abuse of discretion in the district court's apportionment of the supplemental fees.  *See Am. Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352, 384 (Colo. 1994) (reviewing court will uphold allocations of fees if the record affords sufficient support).

## V.    Jury Instruction 27

¶ 72    Finally, GTL asserts that the trial court erred by instructing the jury on Regulation 4-2-3, which regulates advertising by the insurance industry.  Div. of Ins. Reg. 4-2-3, 3 Code Colo. Regs. 702-4.  We are not persuaded.

### A.    Standard of Review

¶ 73    A trial court has substantial discretion in formulating and tendering jury instructions, so long as they include correct statements of the law and fairly and adequately cover the issues presented.  *Tricon Kent Co. v. Lafarge N. Am., Inc.*, 186 P.3d 155,

162 (Colo. App. 2008); *Taylor v. Regents of Univ. of Colo.*, 179 P.3d 246, 248 (Colo. App. 2007). Therefore, we review de novo the jury instruction at issue to assess whether the instruction correctly states the law, *Bedor v. Johnson*, 2013 CO 4, ¶ 8, and review for an abuse of discretion the trial court's decision to give a particular jury instruction. *Id.*

## B. Discussion

¶ 74 The duty of good faith and fair dealing implied in every insurance contract in Colorado extends to the advertisement and purchase of the policy. *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1362-63 (Colo. 1993). To determine whether an insurer has breached this duty, its conduct is measured objectively and is tested based on industry standards. *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004). Administrative rules and agency regulations may help establish the applicable standard of care. *Id.*; *see also Giampapa v. Am. Family Mut. Ins. Co.*, 919 P.2d 838, 842 (Colo. App. 1995). However, even if they do not, they "may nonetheless 'be relevant evidence bearing on the issue of negligent conduct.'" *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 931 (Colo. 1997) (quoting Restatement (Second) of Torts § 288B (Am.

Law Inst. 1965)). Thus, regulations may be "valid, but not conclusive, evidence" of an insurer's breach of the duty of good faith and fair dealing. *Id.*

¶ 75 Regulation 4-2-3 was set forth in Instruction 27. The instruction first explained that "[a]t the time of the sale of the policy at issue in this case, the following regulations of the Division of Insurance . . . were in effect, and applied to the advertisement of policies like the one purchased by Mr. Casper." The instruction then presented excerpts of Regulation 4-2-3, including requirements that all policy limitations and restrictions be "set out conspicuously," and that advertisements not contain misleading representations.

¶ 76 The instruction concluded by stating that "[t]hese regulations are valid, but not conclusive evidence of insurance industry standards, and you may consider such regulations in determining whether the defendant acted unreasonably toward the Plaintiff."

¶ 77 GTL objected to the instruction at trial, contending that it was irrelevant to Casper's remaining claims, given the settlement with Platinum and Gaylord. The district court disagreed, concluding that the instruction related to Casper's theory that GTL's marketing

and sale of the insurance policy, through Platinum, was evidence of its bad faith. We perceive no abuse of the district court's discretion.

¶ 78    One of Casper's theories at trial was that GTL, through Platinum, intentionally misrepresented the nature of the insurance coverage by misleadingly calling the policy a "First Diagnosis" policy when, in fact, hidden and ambiguous language enabled the insurance company to deny benefits if the diagnosis was traceable in any way to advice given prior to the effective date of the policy.

¶ 79    Casper's lawyers discussed advertising and marketing tactics in their opening statement. Many of Casper's witnesses addressed GTL's allegedly deceptive sales practices; one of his expert witnesses testified extensively about Regulation 4-2-3 and the connection between GTL's sales practices and the denial of Casper's claim. Additionally, two of GTL's own witnesses discussed Regulation 4-2-3. They acknowledged that GTL's duty to act in good faith extended to the advertising, marketing, and sale of the insurance policy, but they opined that GTL's conduct had not violated the regulation.

¶ 80    We agree with the district court that the standard of care related to the sale and marketing of the policy was relevant to Casper's claims, and it is undisputed that the instruction was a

41

correct statement of the law. Accordingly, we conclude that the district court did not abuse its discretion in giving the instruction.

## VI. Appellate Attorney Fees

¶ 81 Finally, the Estate asserts that it should be awarded its attorney fees and costs on appeal. We agree that under section 10-3-1116, Casper's estate is entitled to an award of its reasonable appellate attorney fees and costs. *Stresscon*, ¶ 136 ("When a party is awarded attorney fees for a prior stage of the proceedings, it may recover reasonable attorney fees and costs for successfully defending the appeal." (quoting *Melssen*, ¶ 75)).

¶ 82 We exercise our discretion under C.A.R. 39.1 to remand this issue to the district court to determine the total amount of the Estate's reasonable fees and costs incurred on appeal, and to award those fees. *Payan*, ¶ 63 (citing *Martin v. Essrig*, 277 P.3d 857, 862-63 (Colo. App. 2011)).

## VII. Conclusion

¶ 83 The judgment is affirmed, and the case is remanded to the district court to determine and award the total amount of the Estate's reasonable appellate fees and costs allocable to the statutory claim.

JUDGE WEBB and JUDGE ASHBY concur.